Filed 3/24/21  Sabetian v. Fluor Enterprises CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| SORAYA SABETIAN, | B298989 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC699945) |
| v. | |
| FLUOR ENTERPRISES, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed.

Weitz & Luxenberg, Benno Ashrafi and Josiah Parker for Plaintiff and Respondent.

Berkes Crane Robinson & Seal, Robert H. Berkes, Steven M. Crane, Barbara S. Hodous and Carmen Santana for Defendants and Appellants.

———————————————

Defendants Fluor Enterprises, Inc. (FEI), and Middle East Fluor (MEF) (collectively, the Fluor defendants) appeal from a judgment entered after a jury trial in favor of plaintiff Soraya Sabetian.[1]  Soraya and her husband Houshang Sabetian brought claims for negligence, premises liability, and loss of consortium, alleging Sabetian contracted testicular mesothelioma caused by exposure to asbestos while he was an Iranian citizen working for the National Iranian Oil Company (NIOC) from 1959 to 1979 in facilities under construction by the Fluor defendants.  The jury found FEI and MEF were negligent, and their negligence was a substantial cause of Sabetian's injury.

On appeal, the Fluor defendants contend the trial court should have granted their motions for judgment notwithstanding the verdict and for a new trial because substantial evidence does not support the jury's determination Sabetian was exposed to asbestos attributable to the Fluor defendants with sufficient frequency, regularity, and proximity to constitute a substantial factor in causing Sabetian's injury.  They also argue substantial evidence does not support the jury's determination Sabetian's exposure to asbestos caused him to develop mesothelioma in the testes, a rare form of mesothelioma.  Finally, the Fluor defendants assert the trial court erred in denying their post-trial motions to reduce the jury's damages award in accordance with Iranian law.  We affirm.

---

[1]     During the pendency of this appeal, Houshang Sabetian died.  On July 29, 2020 we granted Soraya Sabetian's motion to be substituted in place of Houshang Sabetian as his successor in interest.  To avoid confusion, we refer to Houshang Sabetian as Sabetian and Soraya by her first name.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Complaint*

Sabetian and Soraya filed this action on March 28, 2018 against the Fluor defendants[2] and others, alleging causes of action for negligence, strict liability, premises liability, and loss of consortium.  The complaint alleged the Fluor defendants provided gaskets, packing, and insulation that negligently created asbestos dust Sabetian was exposed to while he worked at Iranian oil refining facilities in the 1960s and 1970s.  In January 2017 Sabetian was diagnosed with mesothelioma, which Sabetian alleged was caused by his exposure to asbestos at these facilities.

B.   *The Sabetians' Case at Trial*

   1.   *The Fluor defendants*

At the beginning of trial, the parties reached a stipulation as to the Fluor defendants' individual responsibilities with respect to construction of the Tehran I, Tehran II, and Esfahan refineries operated by NIOC, and construction of the Crude Distillation Unit No. 85 (CDU-85) at the Esfahan refinery.  Pursuant to the stipulation, the trial court instructed the jury: "With respect to the Tehran [I] refinery project, Fluor International, Inc., was responsible for the engineering,

---

[2]   The Sabetians named seven Fluor entities as defendants in their complaint.  At the beginning of trial, pursuant to the stipulation of the parties, the trial court dismissed with prejudice three of the Fluor defendants, leaving FEI, MEF, Fluor Corporation, and Fluor International, Inc.  The jury found only FEI and MEF acted negligently.

procurement of materials, and construction.  [¶]  With respect to the Tehran [II] refinery project [also known as] Tehran refinery expansion, [MEF] was responsible for the engineering, procurement of materials, and construction.  [¶]  With respect to the Esfahan refinery project, [FEI] . . . was responsible for the design, engineering, procurement of materials, and project management.  [¶]  With respect to the Crude Distillation Unit No. 85 project in Abadan, [FEI] . . . was responsible for the performance of all services which [were] to be performed in the United States and Japan, including but not limited to detailed engineering services, materials[] procurement services, the supply, inspection, and arrangement for the shipment of plant materials and equipment and other related services."

2.      *Presence of Asbestos at the Refineries*

According to Gary Bryan, a designated representative of the Fluor defendants,[3] Fluor performed work on multiple oil refinery construction projects in Iran from 1961 to 1979, including the Tehran I, Tehran II, and Esfahan refinery projects. During the period from 1953 through 1978 or 1979, Fluor purchased calcium silicate insulation from Nippon Asbestos Company (Nippon) for external use in its "pipe[s] and vessel[s]." In the early 1970s companies in the United States "started moving away" from using calcium silicate insulation containing

---

[3]      The Sabetians called Bryan as an adverse witness to explain the use of asbestos in the Fluor defendants' refinery construction projects.  Because the parties stipulated as to the responsibility of each Fluor defendant, the witnesses at trial did not distinguish between the Fluor defendants, typically referring to them collectively as "Fluor," as do we.

asbestos.  However, calcium silicate insulation containing asbestos continued to be available overseas, including in Japan. All of the calcium silicate insulation used in the Tehran 1 construction project came from Nippon and contained asbestos. Construction on Tehran I took place from 1963 through early 1969.

In 1972 NIOC hired Fluor to construct the Tehran II refinery project.  The project design specifications stated the pipe insulation "'shall be molded sectional-type covering of calcium silicate, amosite asbestos, or expanded silica for temperatures up to 1200 degrees Fahrenheit.'"  In 1974 Fluor purchased the calcium silicate pipe insulation from Nippon for use in the construction of Tehran II.  Bryan did not know whether the calcium silicate used at Tehran II contained asbestos.  When the construction of the refinery project was completed in early 1975, Fluor transferred over 20,000 linear feet of unused calcium silicate pipe insulation procured for use at Tehran II to the Esfahan project.

Dominick Pescarolo worked for Fluor on both the Tehran II and Esfahan refinery projects.[4]  According to Pescarolo, Fluor created the design documents for Tehran II, which specified the use of asbestos-containing pipe insulation.  Fluor duplicated the Tehran II specifications for its construction of the Esfahan refinery.  The same vendors approved for Tehran II were approved for construction of Esfahan.  Bidding for the Esfahan project began in 1974 or 1975.

---

[4]     The Fluor defendants designated Pescarolo as their person most qualified.  Excerpts from his deposition testimony were read to the jury.

4

Amanollah Shahabi, assistant refinery manager for the Tehran I and II refineries, similarly testified Fluor "used asbestos-containing material [at Esfahan], exactly the same as Tehran [II]."[5] Shahabi based his view that asbestos-containing materials were used at Esfahan on the facts that "[t]he contract was copied from Tehran [I] and [II]. Approved vendors were the same. Other vendors were the same. Materials were the same." Further, Fluor procured most of the materials for Esfahan in 1972 or 1973. Shahabi explained that "if there [had] been such a change" away from using asbestos-containing materials in Fluor's construction of Esfahan, Shahabi would have "had to [have been] informed," but he did not learn of alternative materials for insulation until 1977.

On October 25, 1976 Fluor sent a telex to the "Fluor Thyssen Joint Venture" in Tehran with the subject "Asbestos Free Insulation [¶] Urgent." (Capitalization omitted.) The message stated, "Nippon Asbestos has stopped their production of insulation containing asbestos. [¶] . . . Were you able to get NIOC to relax their demand that insulation be asbestos free? [¶] . . . Answer urgently required." (Capitalization omitted.) On November 4, 1976, in a message with the subject "Esfahan Refinery Project Asbestos in Insulation," NIOC responded, "Please be advised that we have no objection to the presence of asbestos in calcium silicate insulation if it is contained." (Underlining omitted.)

Sometime after October 25, 1976 Nippon was acquired by or changed its name to Nichias Corporation, and it changed the

_____

[5] Excerpts of Shahabi's videotaped deposition were played for the jury.

5

name of its calcium silicate insulation from "silicalite cover" (which it sold in 1974) to "new silicalite board," while continuing to use the brand name "Tombo 4601." Fluor did not have any invoices, packing slips, or purchase orders showing Fluor ever purchased "new silicalite" products for use in Iran. Fluor completed construction of the Esfahan refinery in 1978 or 1979.[6]

### 3. *Testimony of Sabetian*

Sabetian was born in Tehran, Iran. After studying industrial management in Tehran and London, in 1959 Sabetian began to work for NIOC in its "organization for methods and systems" department, where he remained for most of his career at NIOC. Sabetian's role in the department was to create systems to make NIOC's operations more efficient. Sabetian worked at the Abadan oil refinery from about 1960 until 1963, when he transferred to a fertilizer plant in Shiraz, Iran.

In 1967 Sabetian returned to Tehran and began to travel regularly to several refinery projects that were under construction, including Tehran II, Esfahan, and CDU-85. While working for NIOC during this period, Sabetian was "always [in]

---

[6] The Sabetians also presented evidence at trial regarding the construction of the CDU-85 at the Abadan refinery. We do not reach FEI's contention there is no substantial evidence to support the jury's finding Sabetian was exposed to asbestos attributable to FEI during the construction of CDU-85 because the jury did not distinguish in its verdict between FEI's responsibility for actions taken at Esfahan and at CDU-85, and substantial evidence supports the jury's finding that Sabetian's exposure at Esfahan was a substantial factor in causing development of mesothelioma. Accordingly, we do not discuss the evidence relating to CDU-85.

6

the air," traveling. As part of his job, Sabetian observed the installation of piping and pipe insulation at each refinery he visited. Sabetian sometimes stood as close as two or three feet from where the insulation work was being performed. At other times he was farther away, but he mostly "was close enough to be able to observe the operation." Sabetian's "usual" practice at each site was to observe workers cutting pipe insulation while Sabetian stood between three and eight feet away. The prefabricated pipe insulation had to be "cut to the measure in order to use it." The cutting of pipe insulation "always" produced dust. As Sabetian explained, the insulation material was "always dusty" and "really created a lot of dust." While Sabetian observed the insulation work, there were "people working all over the unit" with insulation. Sabetian would stand a few feet from one worker installing insulation, and at the same time he would be 15 to 20 feet from other workers also performing insulation work.

Construction of Tehran II was "a huge activity," and Sabetian visited the refinery project during its construction "so many times." Sabetian described the work he observed at Tehran II: "You have to make a lot of insulation, putting pipe, putting the different machinery. But the main thing was the insulation activity that Fluor was responsible for." He explained the work at Tehran II was the same as what he had observed at other refineries he visited. He added, "What I observed it is all similar. I mean, nothing, no difference." Sabetian observed workers at Tehran II working with pipe insulation on "[d]efinitely more than ten" occasions.

Sabetian visited Esfahan "more than 10 [or] 12 time[s]" during its construction. The construction of Esfahan was "similar to other refineries," with workers "cutting pipe" and "installing

7

the pump machinery." Sabetian observed workers "using insulation for the equipment." Sabetian explained insulation was "really one of the main biggest activity that . . . building a refinery needs. Every corner, every part of the refinery, the machinery has to be insulated in order to be operational." When the pipe insulation at Esfahan was cut, "similar to other refineries that [Sabetian] observed [there was] always dust." Sabetian observed the cutting of pipe insulation at Esfahan "many times, so many times" while standing "between three to seven, eight feet away from the actual operation." Sabetian described the insulation process as the "same as usual."

On cross-examination, Sabetian denied that Esfahan was 95 percent completed when he first visited the refinery. However, defense counsel played for the jury an excerpt from Sabetian's videotaped deposition testimony:

"'[Q]: When you visited the Esfahan refinery, would you visit the units that had already completed construction and were working units?[']"

"'[A]: When I visited Esfahan, the refinery was nearly 95 percent finished. . . . And they were starting to start up some of the units.'"

Sabetian explained at trial, "I think if I made such a statement, it is wrong because it wasn't – because it took four years or more. And it faces the revolution, which stopped . . . [the] finishing [of] the refinery."

Breathing the dust caused by the cutting of pipe insulation at the refinery project sites would sometimes cause Sabetian to cough. Sabetian did not know, and was never informed, the dust was a health hazard. According to Sabetian, "Absolutely nobody told us this . . . dust would really affect your health."

8

In 1979 Sabetian retired from his position with NIOC and fled Iran to escape the revolution, eventually settling in Los Angeles in 1980 or 1981. On cross-examination, defense counsel elicited testimony from Sabetian about his 1982 application to the United States Department of Justice's Immigration and Naturalization Service (immigration application). The immigration application directed Sabetian to list his "employment [for the] last five years." (Capitalization omitted.) In response, Sabetian listed his occupation as the head of NIOC's industrial department from 1975 to 1980. Sabetian signed the declaration, declaring under penalty of perjury the information was true and correct. The immigration application stated, "Severe penalties are provided by law for knowingly and willfully falsifying or concealing a material fact." (Capitalization omitted.)

In 2017 Sabetian was diagnosed with mesothelioma of the tunica vaginalis testis (TVT). Sabetian's right testicle was surgically removed. Pathological diagnosis of the removed testicle showed malignant mesothelioma of the TVT.

### 4. *The Sabetians' Expert Evidence*
#### (a) Dr. Daneshmand

Dr. Sia Daneshmand, a urologic oncologist, treated Sabetian's mesothelioma of the TVT, which was only the second case of the disease he had treated in his career.[7] Dr. Daneshmand explained the tunica vaginalis is comprised of mesothelial cells identical to the mesothelial cells located in the pleura, the peritoneum, and the pericardium. Dr. Daneshmand

---

[7] Dr. Daneshmand's videotaped deposition testimony was played for the jury.

opined, "[G]iven the known risks and if I were told [Sabetian] had significant exposure to asbestos, I would assume more likely than not that [asbestos exposure] was a contributing cause of his disease . . . ." Dr. Daneshmand explained, "[I]t's incredibly rare to develop [mesothelioma] in the tunica vaginalis, but half the cases that I had read about had some exposure to asbestos, and it is presumed to have the same risk factor." Asbestos exposure "appears to be the only plausible risk factor for development" of Sabetian's condition. On cross-examination, Dr. Daneshmand acknowledged he had not "exhaustively looked at the literature" regarding the epidemiology of the disease. He also acknowledged there are many reported cases of mesothelioma of the TVT in individuals with no known asbestos exposure.

(b) Kenneth Garza

Kenneth Garza, a certified industrial hygienist,[8] opined asbestos is present at "a background level" in the ambient air at a range between .00000001 and .0001 asbestos fibers per cubic centimeter. Industrial hygiene seeks to reduce industrial asbestos levels to these background levels. Based on his review of industrial hygiene literature and his familiarity with the insulation products used in Iranian refineries, Garza opined to a reasonable degree of scientific certainty that where asbestos-containing dust is visible to the naked eye, a bystander would be exposed to levels between 20 and 100 asbestos fibers per cubic centimeter. Garza added, "And in this case, [Sabetian] was within feet, so that's pretty darn close to that activity."

---

[8] Industrial hygiene involves "anticipating, recognizing, evaluating, and controlling hazards in the workplace," including the hazard of asbestos.

(c)     Dr. Horn

Dr. Barry Horn, an occupational medicine specialist and board certified pulmonologist,[9] opined that exposure to asbestos in the ambient air differed from exposure in an occupational setting because "in an occupational setting, you overwhelm the body's defense mechanisms. . . . [¶] . . . And when you inhale foreign material down in the lung, [alveolar macrophages][10] get stimulated and go over to the area where these foreign particles are and gobble them up.  [¶]  That leads to a whole series of complex chemical reactions, which . . . cause other cells to move into the lung and to produce potential[] changes in DNA that can ultimately lead to cancer."  While the human body can handle a "very modest exposure to asbestos," a large exposure overwhelms the body's defense mechanisms causing an inflammatory response, "which result[s] in a whole variety of responses, one of which is to produce scarring, another is to produce cancer." Dr. Horn opined that standing 10 feet away from a person cutting asbestos-containing pipe insulation would be considered an occupational exposure to asbestos, which would be significant in increasing the exposed individual's risk of developing mesothelioma.  Plaintiffs' counsel presented a hypothetical in which Sabetian "was within ten feet of people cutting or removing asbestos pipe insulation on several occasions in the 1960s and 1970s" that "created visible dust at the point of work, and assume Mr. Sabetian was breathing."  When asked whether under the

---

[9]     Pulmonology is "the study of diseases of the lung or diseases of other body parts that impact lung function."

[10]     Dr. Horn described alveolar macrophages as "scavenger white blood cells" in the air sacs of the distal airways.

hypothetical "each of those occasions [was] significant in increasing the risk of Mr. Sabetian's development of malignant mesothelioma," Dr. Horn responded, "Yes."

(d)    Dr. Zhang

Dr. David Zhang, a physician and occupational medicine practitioner, testified occupational medicine focuses on finding the cause of disease. Although Dr. Zhang is not an epidemiologist, he was trained to interpret and apply epidemiological studies.

Dr. Zhang explained asbestos fibers are most often inhaled into the lungs, and from there the fibers may move throughout the body in lymphatic fluid that flows throughout the mesothelial linings or in defensive macrophages (white blood cells) that consume the fibers and carry them to other parts of the body. "[T]he fiber inhaled in the lung, carried by the macrophage or by lymphatic fluid, travels from the lung to the pleura, to the abdomen, and to the scrotum." An individual exposed to asbestos may not develop mesothelioma until 40 to 60 years after the exposure.

Dr. Zhang opined, "The scientific community who is familiar with asbestos-related disease would agree that asbestos, no matter what type of asbestos, can cause all types of mesotheliomas in any location lined by the mesothelial cells." Mesothelioma of different areas of the body is the same disease with the same cell origin, but with a different location. When asked whether "the mesothelioma that originates in the tunica vaginalis [membrane covering the testes] [is] a different disease than a mesothelioma that originates in the peritoneum or the pleura [membrane covering the lungs]," Dr. Zhang responded,

12

"No, it's the same disease from the same cell origin."  Dr. Zhang opined, "[I]f you are exposed to asbestos, you will increase the risk to develop mesothelioma—pleural, peritoneal, pericardial, or tunica vaginalis [(TVT)]."  Further, if Sabetian was exposed to asbestos, the exposure "definitely" caused Sabetian's mesothelioma of the TVT.

In reaching his opinion, Dr. Zhang relied on a report titled "Asbestos, Asbestosis, and Cancer, the Helsinki Criteria for Diagnosis and Attribution" (Helsinki consensus report), which was the product of a 1997 meeting of 19 specialists held in Helsinki, Finland.  The Helsinki consensus report was updated in 2015 following a meeting of over 20 scientists and doctors in 2014.  Dr. Zhang stated as to the report there was a consensus that asbestos causes all different forms of mesothelioma.  The Helsinki consensus report identified areas in need of further research, but those did not include whether inhalation of asbestos fibers can cause mesothelioma in all mesothelial linings throughout the body.  Both reports were published in the Scandinavian Journal "Work, Environmental Health."[11] Dr. Zhang expressed his agreement with the consensus report's conclusion there is "no need to find asbestos fibers in the tissue to attribute the mesothelioma to asbestos exposure."

Dr. Zhang also based his opinion on his review of more than 30 case reports and case series reports published in the peer-reviewed scientific literature concerning mesothelioma of the

---

[11]	Although plaintiffs' counsel marked the 1997 Helsinki consensus report and the 2015 updated report as Exhibits 29 and 30, neither was introduced into evidence at trial, and they are not part of the record on appeal.

13

TVT,[12] as well as one epidemiological study showing that asbestos can cause pleural peritoneal mesothelioma. Dr. Zhang stated mesothelioma of the TVT is very rare, occurring in only about one in 10 million persons. The rarity of the condition makes it difficult to conduct an epidemiological study at the appropriate scale. Dr. Zhang explained, "[Y]ou probably need the entire world [to participate in the study] to generate enough testicular mesothelioma to look at this one," making it "virtually impossible to do this study." For this reason, "case reports sometimes are very important . . . especially for the rare disease." Case reports are written by treating physicians regarding interesting medical cases; case series reports are based on evaluation of multiple individuals. Dr. Zhang gave as an example of the importance of case reports that Crohn's disease was identified by Dr. Crohn, who prepared a case report on the disease, leading to a treatment, even though there were not epidemiological studies showing the disease was an autoimmune disease.

In reaching his opinions, Dr. Zhang relied on a case report "that shows that those who have exposure [to asbestos] increase

---

[12] "Case reports are reports by a clinician of the occurrence of a disease in a particular individual. When there are multiple case reports regarding an unusual occurrence of a certain disease among a group, the study is referred to as a case series report. ([H.] Checkoway et al., Research Methods in Occupational Epidemiology (2d ed. 2004) p. 59 (Occupational Epidemiology).)" (*Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477, 491.) The list of medical reports relied on by Dr. Zhang was marked by plaintiffs' counsel as Exhibit 28, but does not appear to have been admitted into evidence at trial.

the risk of developing in particular tunica vaginalis mesothelioma." Dr. Zhang also reviewed the Mensi case series report of individuals exposed to asbestos in Italy, which showed "in the Italian cohort, . . . they have people develop the testicular mesothelioma." Dr. Zhang identified an additional case series report by Dr. Attanoos that "reported testicular mesothelioma and exposure responsible for some of the disease or some of the cases."

Dr. Zhang acknowledged there were reported cases of mesothelioma of the TVT in patients with no documented history of asbestos exposure. He explained patients may not be aware of their exposure to asbestos, and the determination of whether they have been exposed may depend on the quality of the medical interview, for example, evaluating the patient's prior work history. Also, it is difficult for people to recall an exposure 20 to 30 years earlier.

5. *Defense Case*

Dr. Dominik Alexander, who has a Ph.D. in epidemiology, testified for the defense. He explained epidemiology is "the study of the distribution and determinants of disease in human populations." Further, epidemiologists are "interested in the causes of disease in human populations and the patterns of disease nationally and internationally." Dr. Alexander opined the available medical literature on health outcomes for individuals exposed to occupational asbestos did not support the conclusion exposure to asbestos dust is a cause of mesothelioma of the TVT, although the studies show an increased risk of pleural mesothelioma among workers exposed to asbestos fibers. He testified that out of "hundreds" of analytical epidemiological

15

studies, none reported individuals exposed to occupational asbestos contracted mesothelioma of the TVT.

On cross-examination, Sabetian's attorney asked Dr. Alexander to explain the meaning of the statement in the Helsinki consensus report that "[m]alignant mesothelioma affecting any serosal membrane may be induced by asbestos inhalation." Dr. Alexander responded, "I think it speaks for itself. I believe that the authors are indicating that – exactly what it says, malignant mesothelioma may affect any serosal membrane." But Dr. Alexander disagreed with the statement in the report that "[a]ll types of malignant mesothelioma can be induced by asbestos with amphiboles showing greater carcinogenic potency than chrysotile." Dr. Alexander opined there was "no analytical epidemiologic evidence . . . supporting a conclusion that asbestos exposure of any fiber type is even associated" with mesothelioma of the TVT.

C.    *The Jury Verdict*

The jury found on a special verdict form that FEI, MEF, and NIOC were negligent, and that their negligence was a substantial factor contributing to Sabetian's risk of developing mesothelioma. The jury found the other defendants had not acted negligently.

The jury awarded Sabetian $6 million and Soraya $3 million for past noneconomic loss and $8 million to each plaintiff for future noneconomic loss, for a total of $25 million in damages. The jury found FEI was 60 percent responsible for the harm to Sabetian, while MEF and NIOC were each 20 percent responsible.

16

D.      *Fluor Defendants' Motions for Judgment Notwithstanding the Verdict and for New Trial*

The Fluor defendants filed motions for judgment notwithstanding the verdict (JNOV) in which they argued there was not substantial evidence of Sabetian's exposure to asbestos attributable to the Fluor defendants or that exposure to asbestos causes mesothelioma of the TVT. The Fluor defendants also challenged the award of damages to Soraya on the basis damages for loss of consortium were not available under Iranian law, which they argued applied to the case.

The Fluor defendants also filed a motion for new trial raising the same issues and arguing the jury's award of damages was excessive and contrary to Iranian law. In support of both motions the Fluor defendants submitted a supplemental declaration by Iranian law expert Mahmoud Katirai, which we discuss below.

The trial court denied the JNOV motions. It also denied the new trial motion as to Sabetian, but it conditionally granted the motion as to Soraya unless she consented to a reduction in damages, finding the jury's damages award was excessive and should be reduced from $11 million to $1.4 million (comprised of $400,000 for past loss of consortium, and $1 million for future loss of consortium).

As to the Fluor defendants' contention Iranian law applied and limited recoverable damages, the court "decline[d] to deviate from the pre-trial rulings issued by Judge John [J.] Kralik regarding the application of Iranian law.[13] First, none of the

---

[13]     Judge Kralik presided over the pretrial choice of law motions and issued the ruling on the motions. In October 24,

17

parties indicated that it wanted this Court to apply Iranian law during the trial. Had the Court applied Iranian law, the jury would have been asked to deliberate the case based on the law given to it, and the jury has been discharged. Second, the Court interprets Judge Kralik's rulings to preclude the application of Iranian law in this case. The Court notes that Defendants have not waived their objections to applying Iranian law to the verdict, and presumably, Defendants can challenge Judge Kralik's rulings directly with the Court of Appeal[]."

Soraya accepted the remittitur of the damage award to $1.4 million. On July 3, 2019 the trial court entered an amended judgment for the Sabetians. The Fluor defendants timely appealed.

## DISCUSSION

A. *Standard of Review*

"'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*); accord, *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 313 (*Johnson & Johnson*).) "'"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must

2018 Judge Kralik granted in part and denied in part the defense motions to apply Iranian law, which we discuss below.

18

affirm the denial of the motion.""" (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 684; accord, *Cabral*, at p. 770; see *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 639 [denial of a motion for judgment notwithstanding the verdict "is essentially the same as appealing the judgment itself for a lack of substantial evidence"].)[14]

The appellate court, like the trial court, may not reweigh the evidence or judge the credibility of witnesses. (*Johnson & Johnson, supra*, 37 Cal.App.5th at p. 313.) """"If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied."""" (*Ibid.*, quoting *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) "The denial of a new trial motion is reviewed for an abuse of discretion, except that a trial court's factual determinations are reviewed under the substantial evidence test." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7; see *People v. Johnson* (2019) 8 Cal.5th 475, 524 ["We will not disturb a trial court's denial of a motion for a new trial unless 'a "manifest and unmistakable abuse of discretion"' clearly appears."].)

Code of Civil Procedure section 657 provides seven grounds for granting a new trial where the error "materially affect[s] the substantial rights" of a party, including as applicable here: "5. Excessive or inadequate damages. [¶] 6. Insufficiency of the evidence to justify the verdict or other decision, or the verdict or

---

[14] We apply the same substantial evidence standard to an appeal from a judgment following a jury trial. (*Flores v. Liu* (2021) 60 Cal.App.5th 278; *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026.)

other decision is against law.  [and]  [¶]  7. Error in law, occurring at the trial and excepted to by the party making the application." However, "[a] new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  (Code Civ. Proc., § 657.)

B.      *Substantial Evidence Supports the Jury's Finding Exposure to Asbestos Attributable to the Fluor Defendants Was a Substantial Factor in Causing Sabetian's TVT Mesothelioma*

The Fluor defendants contend substantial evidence does not support the jury's finding Sabetian was exposed to asbestos attributable to the Fluor defendants in quantities sufficient to cause his mesothelioma.  They further argue substantial evidence does not support the jury's finding inhalation of asbestos dust was a substantial factor in contributing to Sabetian's risk of developing mesothelioma of the TVT because there is no evidence asbestos exposure can cause mesothelioma of the TVT.  We agree with Soraya substantial evidence supports the jury's verdict.

To prove exposure to asbestos from a particular product was a legal cause of a plaintiff's injury, the plaintiff must satisfy the two-part test enunciated by the Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 (*Rutherford*).  "[T]he plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was

20

a 'legal cause' of his injury, i.e., a substantial factor in bringing about the injury." (*Id.* at p. 982, fn. omitted, italics omitted; accord, *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 488.) "If an asbestos plaintiff fails to prove exposure, there is no causation and no liability as a matter of law." (*LAOSD Asbestos Cases*, at p. 488; accord, *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 251 (*Shiffer*); *Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1438.)

"[P]laintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." (*Rutherford, supra*, 16 Cal.4th at pp. 976-977, fn. omitted; accord, *LAOSD Asbestos Cases, supra*, 44 Cal.App.5th at p. 488.) "[A] particular asbestos-containing product is deemed to be a substantial factor in bringing about the injury if its contribution to the plaintiff['s] or decedent's *risk* or *probability* of developing cancer was substantial." (*Rutherford*, at p. 977.)

In determining whether the plaintiff's inhalation of asbestos fibers from a particular product is a "'substantial factor'" contributing to the plaintiff's cancer, relevant factors include "the length, frequency, proximity and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors

21

affecting the assessment of comparative risk . . . ." (*Rutherford, supra,* 16 Cal.4th at p. 975; accord, *Johnson v. ArvinMeritor, Inc.* (2017) 9 Cal.App.5th 234, 240, 245 [affirming grant of summary judgment for defendants where plaintiff presented evidence defendants' brake lining components contained asbestos and plaintiff's father handled brake linings in his vehicle repair work (to which plaintiff was exposed), but plaintiff failed to raise triable issue that defendants produced the brake linings handled by plaintiff's father].)

1. *Substantial evidence supports the jury's finding Sabetian was exposed to asbestos attributable to FEI*

FEI contends there is no substantial evidence the pipe insulation used at the Esfahan refinery contained asbestos because Nippon did not ship its pipe insulation to Esfahan until January 1977, by which time Nippon was no longer using asbestos in its calcium silicate pipe insulation. FEI also asserts there is not substantial evidence Sabetian was exposed to asbestos during pipe cutting operations at the Esfahan refinery. We agree with Soraya there is substantial evidence FEI used asbestos-containing pipe insulation at Esfahan to which Sabetian was exposed.

At trial the Sabetians presented evidence the design documents for Tehran II specified the use of asbestos-containing pipe insulation. MEF procured calcium silicate pipe insulation from Nippon in 1974 for use in the construction of Tehran II. The Fluor defendants do not dispute the pipe insulation used at Tehran II contained asbestos. At some point over 20,000 linear feet of unused calcium silicate pipe insulation was transferred from Tehran II to the Esfahan project. The same design

22

specifications used for Tehran II were again used for the Esfahan project. Further, Fluor[15] procured most or all of the calcium silicate pipe insulation for the Esfahan project from Nippon, as it did for the Tehran I and Tehran II projects. Shahabi confirmed Fluor "used asbestos-containing material [at Esfahan], exactly the same as Tehran [II]," explaining he did not learn of the use of asbestos-free insulation until 1977.

Fluor's urgent request in 1976 to use asbestos-containing insulation at Esfahan, which NIOC granted, further supports the inference Fluor procured asbestos-containing insulation for use at Esfahan. As discussed, sometime before October 25, 1976 FEI learned Nippon was no longer going to produce asbestos-containing insulation. FEI then "urgently" requested NIOC "relax [its] demand that insulation be asbestos free." In November 1976 NIOC granted FEI permission to use asbestos-containing calcium silicate insulation "if it is contained." Nippon then changed the name of its calcium silicate insulation product from "silicalite cover" to "new silicalite cover." But Fluor did not present evidence it ever purchased "new silicalite" insulation for Esfahan.[16] In 1977 FEI received two shipments of calcium silicate pipe insulation from Nippon totaling approximately 675,000 linear feet of insulation. FEI argues this pipe insulation would not have contained asbestos because by then Nippon had

---

[15]     As discussed, the witnesses referred to the Fluor defendants collectively as "Fluor." However, the testimony about Fluor with respect to the Esfahan refinery refers to FEI because it was responsible for construction at that refinery.

[16]     Contrary to FEI's contention, Soraya does not argue the change of the company name from Nippon to Nichias Corporation is evidence the insulation used at Esfahan contained asbestos.

changed its product. But the Sabetians presented an invoice for the January 1977 shipment of insulation showing the insulation had been ordered from Nippon pursuant to a June 21, 1975 contract—before Nippon switched to a new product. The invoice states Nippon was providing "[m]aterial and [e]quipment as per contract," supporting an inference that Nippon had shipped its earlier "silicalite cover" product containing asbestos. This evidence supports a reasonable inference FEI used asbestos-containing insulation at Esfahan.[17]

FEI's argument Sabetian had insufficient contact with the cutting of pipe insulation at the Esfahan refinery to show his exposure was a legal cause of his developing mesothelioma also lacks merit. Sabetian testified he visited Esfahan more than 10 or 12 times during its construction. He observed workers cutting

---

[17] FEI also asserts the evidence did not show whether the insulation Sabetian observed being cut contained asbestos because Sabetian did not know whether he observed the cutting of insulation for high- or low-temperature pipes. But FEI has not provided any citation to the record for its assertion only insulation for high-temperature pipes "could possibly have asbestos insulation." FEI's contention is therefore forfeited. (See *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 ["'[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.'"]; *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457 [plaintiffs forfeited claim of error by failing to "present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"]; Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

24

pipe and using insulation for the equipment, and he described the cutting of the pipe insulation as always creating dust. Sabetian observed the cutting of pipe insulation at Esfahan "so many times" while he was standing "between three to seven, eight feet away from the actual operation."[18]

> 2. *Substantial evidence supports the jury's finding Sabetian's exposure to asbestos attributable to MEF at the Tehran II refinery project was a substantial factor in causing his injury*

MEF contends there is no substantial evidence Sabetian's exposure to asbestos at the Tehran II refinery project was a substantial factor in causing his mesothelioma because there is no evidence of the proximity, duration, or intensity of Sabetian's exposure to asbestos dust at Tehran II. MEF also argues Sabetian stated under oath in his immigration application he worked for NIOC from 1975 to 1980, which MEF argues is inconsistent with Sabetian's testimony he observed construction

---

[18] FEI points out Sabetian was later asked, "Why did you need to be so close to the insulation process?" to which he responded, "Well, in actual fact, I wasn't too close. But sometime[s] the measuring the distance perhaps was very difficult. . . . I may actually have been more than three feet or four feet or five feet, something like that." It was the role of the jury to judge Sabetian's credibility and weigh the evidence in determining how close he was to the cutting of the insulation. (*Johnson & Johnson, supra*, 37 Cal.App.5th at p. 313.) It was a reasonable inference that Sabetian was close enough to the cutting of pipe insulation that he was exposed to visible asbestos dust.

25

at Tehran II because construction was completed by January 1975.  Neither contention has merit.

Construction of Tehran II began in the early 1970s and concluded in January 1975.  During the 1970s, Sabetian was regularly traveling to multiple refinery projects under construction, including Tehran II.  Sabetian visited Tehran II "so many times" during its construction.  Sabetian testified he observed at Tehran II the same type of work he saw at other refineries, including "the insulation activity that Fluor was responsible for."  He observed Fluor workers installing pipe insulation at Tehran II on more than 10 occasions.  Sabetian's usual practice was to observe the cutting of pipe insulation while he was standing three to eight feet away.  While Sabetian observed the work, there were "people working all over the unit" with insulation.  And cutting the insulation "always" produced "a lot of dust."

Industrial hygienist Garza opined that where asbestos-containing dust is visible to the naked eye, a bystander would be exposed to levels of asbestos fibers many orders of magnitude greater than the amount in the ambient air and that Sabetian's position within feet of the insulation cutting was "pretty darn close."  Dr. Horn similarly testified that a bystander positioned 10 feet from the cutting of asbestos-containing pipe insulation and exposed to visible dust in the air would experience an occupational exposure to asbestos that significantly increased the bystander's risk of developing mesothelioma.

The testimony from Sabetian, Garza, and Dr. Horn provides substantial evidence from which the jury could reasonably have concluded that Sabetian's observation of Fluor workers installing pipe insulation at Tehran II on more than 10

occasions substantially contributed to the aggregate dose of asbestos Sabetian inhaled and was a substantial factor in increasing his risk of developing mesothelioma.

*Shiffer, supra*, 240 Cal.App.4th 246, relied on by MEF, is distinguishable. There, the plaintiff contended he was exposed to asbestos in turbine insulation the defendant provided to a power plant where plaintiff worked during one summer. (*Id.* at p. 248.) In affirming the trial court's grant of summary judgment for the defendant, the Court of Appeal concluded the plaintiff in his declaration stated only that he "'observed construction . . . including insulators insulating piping in the turbine building.' Although he also declared he was frequently *in the turbine room* for training, he did not say whether or on how many occasions he observed the insulation process, itself, or whether he merely saw the results of the process after being off-site for some time. Mere presence at a site where asbestos was present is insufficient to establish legally significant asbestos exposure." (*Id.* at p. 252.) In contrast, Sabetian testified he stood three to eight feet from workers cutting pipe insulation on more than 10 occasions, from which the jury could reasonably conclude Sabetian was exposed to occupational levels of asbestos dust that significantly increased his risk of developing mesothelioma.[19]

MEF also argues Sabetian's statement in his 1982 immigration application—that he worked as head of NIOC's industrial department from 1975 to 1980—contradicted his trial testimony he visited Tehran II many times during its construction, because MEF completed construction of Tehran II

---

[19] MEF also relies on *McIndoe v. Huntington Ingalls Inc.* (9th Cir. 2016) 817 F.3d 1170, 1173, but that case involved application of federal maritime law, not California law.

in January 1975.  However, at trial, "contradictions between a witness's testimony and his or her prior statements, under oath or otherwise, affect only the witness's credibility, and it is exclusively the function of the jury to determine which, if any, of a witness's assertions are credible."  (*Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 446; accord, *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 878 ["[T]he fact that inconsistencies may occur in the testimony of a given witness does not require that such testimony be disregarded in its entirety for the purposes of a motion for judgment notwithstanding the verdict . . . .  It is for the trier of fact to consider internal inconsistencies in testimony, to resolve them if this is possible, and to determine what weight should be given to such testimony."], overruled on another ground by *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124.)

Sabetian's statements in his immigration application and at trial are not necessarily contradictory.  The immigration form requested Sabetian list his "employment last five years." Sabetian submitted his application in July 1982 and stated he was last employed from 1975 to 1980 as the head of NIOC's industrial department.  Nowhere did the form request Sabetian list his employment other than for the latest five-year period. The jury could have reasonably inferred Sabetian properly responded to the precise question on the form—asking for the last five years of employment—or that Sabetian was employed by NIOC prior to that time in a position other than as head of the industrial department.  And to the extent the application was inconsistent with Sabetian's testimony, it was the jury's function to assess Sabetian's credibility and resolve any inconsistencies.

28

(*Clemmer v. Hartford Insurance Co., supra*, 22 Cal.3d at p. 878;
*Lobo v. Tamco, supra*, 230 Cal.App.4th at p. 446.)[20]


       3.     *Substantial evidence supports the jury's finding*
               *exposure to asbestos was the legal cause of Sabetian*
               *developing mesothelioma of the TVT*

The Fluor defendants argue there is no substantial evidence asbestos exposure can cause Sabetian's particular injury, mesothelioma of the TVT. They contend the testimony of Drs. Daneshmand and Zhang regarding causation does not constitute substantial evidence because the testimony lacked foundation in appropriate medical literature. Specifically, the

---

[20]    MEF's reliance on *Davis v. Foster Wheeler Energy Corp.* (2012) 205 Cal.App.4th 731 is misplaced. In *Davis*, the plaintiffs alleged the deceased husband of one of the plaintiffs (Ronald Davis) was exposed to asbestos dust from the defendant's stripping of old asbestos-containing insulation from the boilers at Davis's jobsite. (*Id.* at pp. 734-735.) Plaintiffs relied on deposition testimony from Davis's coworker that the coworker had witnessed a contractor wearing a hat bearing the defendant's initials remove insulation from around the boiler. (*Ibid.*) However, when the coworker was asked in other deposition testimony who employed the worker who had removed the insulation, the coworker answered he had no information that the worker was employed by defendant. (*Id.* at p. 735.) The Court of Appeal affirmed the trial court's grant of summary judgment for the defendant, concluding the coworker's deposition testimony was "not ambiguous, but is contradictory," and it therefore could not create a triable issue of fact to defeat summary judgment. (*Id.* at pp. 735-736.) The *Davis* court also acknowledged a different standard would apply where, as here, the court is evaluating a post-trial motion for judgment notwithstanding the verdict. (*Id.* at p. 736.)

29

Fluor defendants contend there are no epidemiological studies that establish the requisite causation. Although the Fluor defendants are correct that Dr. Zhang did not principally rely on epidemiological studies to support his conclusions, his opinions were properly based on the medical literature.[21]

"[E]ven when [a] witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*); accord, *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.) "'[W]hen an expert bases his or her conclusion on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," the expert's opinion "cannot rise to the dignity of substantial evidence" . . . . [Citations.]'" (*Johnson & Johnson, supra*, 37 Cal.App.5th at p. 314; accord, *Jennings*, at p. 1117 ["[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.'"]; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*) ["the matter relied on must provide a reasonable basis for the particular opinion offered, and . . . an expert opinion based on speculation or conjecture is inadmissible"].)

---

[21]     Because we conclude Dr. Zhang's testimony is substantial evidence from which the jury could conclude inhalation of asbestos dust caused Sabetian's mesothelioma of the TVT, we do not address the Fluor defendants' challenges to the testimony of Dr. Daneshmand.

30

"[A]n expert's conclusory opinion that something did occur, when unaccompanied by a reasoned explanation illuminating how the expert employed his or her superior knowledge and training to connect the facts with the ultimate conclusion, does not assist the jury. In this latter circumstance, the jury remains unenlightened in how or why the facts *could* support the conclusion urged by the expert, and therefore the jury remains unequipped with the tools to decide whether it is more probable than not that the facts *do* support the conclusion urged by the expert." (*Jennings, supra*, 114 Cal.App.4th at p. 1117.) However, "an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm." (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 580; accord, *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1210.)

The Fluor defendants' argument the Sabetians' experts "did not opine that asbestos exposure can cause TVT mesothelioma as a general proposition" is contrary to the record. Dr. Zhang opined at trial that "asbestos, no matter what type of asbestos, can cause *all types of mesotheliomas in any location lined by the mesothelial cells*." (Italics added.) He opined further, "If you are exposed to asbestos, you will increase the risk to develop mesothelioma— pleural, peritoneal, pericardial, or tunica vaginalis [(TVT)]." In reaching his opinion, Dr. Zhang relied on the Helsinki consensus report, more than 30 case reports and case series reports, and one epidemiological study. He also based his opinion on how the human body's defense mechanisms cause the asbestos fibers to travel from the lungs to other parts of the body. As Dr. Zhang testified, "[T]he fiber inhaled in the lung, carried by the

31

macrophage or by lymphatic fluid, travels from the lung to the pleura, to the abdomen, and to the scrotum."

The Fluor defendants contend the Helsinki consensus report is not a reliable source for Dr. Zhang's opinion because it was the product "of a meeting convened 'to discuss disorders of the lung and pleura in association with asbestos,'" not mesothelioma of the TVT. But the Fluor defendants provide no citation to the record for this quote regarding the purpose of the Helsinki meeting. They respond that no party introduced the Helsinki consensus report into evidence at trial. But an expert may rely on medical reports regardless of whether the report is admissible or introduced into evidence. (*People v. Linton* (2013) 56 Cal.4th 1146, 1200 ["'An expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably . . . be relied upon' for that purpose.'"].)

Further, although the Helsinki consensus report and updated report are not in the record, during his cross-examination defense expert Dr. Alexander acknowledged the report stated, "Malignant mesothelioma affecting any serosal membrane may be induced by asbestos inhalation," and further, "All types of malignant mesothelioma can be induced by asbestos . . . ." Of course, malignant mesothelioma of the TVT is a type of malignant mesothelioma. Although Dr. Alexander expressed disagreement with these statements, they bely the Fluor defendants' assertion the report reached no conclusions regarding mesothelioma of the TVT.

The Fluor defendants' challenge to the medical literature relied on by Dr. Zhang to support his opinions rings hollow. As part of their challenge, the Fluor defendants cherry pick a

32

handful of studies of the 30 on which Dr. Zhang relied. For example, the Fluor defendants point out that one of the articles relied on by Dr. Zhang reported only six out of 24 patients who developed mesothelioma of the TVT had confirmed asbestos exposure. But Dr. Zhang noted nine of the patients in the study did not specify whether or not they had any history of asbestos exposure. The Fluor defendants point out that in another article relied on by Dr. Zhang, only about one-third of the 74 patients who had developed mesothelioma of the TVT had confirmed asbestos exposure. But Dr. Zhang emphasized the other patients did not report any *known* exposure. As Dr. Zhang explained, "[E]xposure history sometimes can be very, very challenging" and depends on the quality of the patient evaluation because individuals may not recognize asbestos exposure when it occurs, and there is "recall bias" inherent in the passage of time from exposure to the development of the disease. The Fluor defendants attack this explanation as "partisan" and "baseless," but it is not an unreasonable proposition that persons exposed to asbestos may not recognize they have been exposed and may not recall their exposure given the lengthy passage of time (up to 60 years) before mesothelioma manifests itself.

The Fluor defendants assert further that Dr. Zhang acknowledged there are no epidemiological studies performed that show asbestos exposure specifically causes mesothelioma of the TVT.[22] They also point to Dr. Zhang's testimony on cross-

---

[22] Dr. Zhang relied on one epidemiological study showing that asbestos can cause pleural peritoneal mesothelioma in reaching his conclusion, but defense counsel failed to cross-examine Dr. Zhang about the study. The record contains no additional testimony about the study.

examination about an epidemiological study of 17,800 individuals who worked in occupations typically involving high levels of asbestos exposure. Dr. Zhang acknowledged there were no recorded cases of mesothelioma of the TVT among this cohort, but he explained that "documentation of the disease [was] not accurate . . . during the time of [the] study." Specifically, mesothelioma of the TVT historically had been misdiagnosed as adenocarcinoma; the study author relied on death certificates for the diagnoses; and the author later acknowledged he misclassified "quite a lot" of the cases.

The Fluor defendants cite federal authorities for the proposition only epidemiological studies, not case reports or case series reports, can support an expert's opinion on causation in a toxic tort case. The Court of Appeal in *Davis v. Honeywell Internat. Inc.* (2016) 245 Cal.App.4th 477 rejected this argument, reasoning, "While [defendant] is generally correct that in many (or even most) instances epidemiological studies provide the best evidence of causation, its implied argument that it is improper for an expert to rely upon any other tools to determine causation, such as case reports, is not universally accepted." (*Id*. at p. 491, fn. omitted.) Further, "'[c]ase series reports can be virtually conclusive in their own right when the health outcome identified is a very rare disease or an uncommon manifestation of a relatively common condition.'" (*Ibid*., quoting H. Checkoway et al., Research Methods in Occupational Epidemiology (2d ed. 2004) p. 78.) In *Davis*, the Court of Appeal concluded the trial court properly allowed plaintiff's expert to testify at trial as to whether the decedent's exposure as a mechanic to defendant's asbestos-containing brake linings substantially contributed to his development of mesothelioma, where the expert principally relied

34

on case reports to support his opinions and several epidemiological studies had shown no association between the mechanics' exposure and the risk of developing mesothelioma. (*Davis,* at pp. 480, 489, 491-492.) The Court of Appeal explained the trial court's gatekeeping function under *Sargon, supra,* 55 Cal.4th at page 769 "bars expert opinion only if it fails to meet the minimum qualifications for admission. If the opinion is based on materials on which the expert may reasonably rely in forming the opinion, and flows in a reasoned chain of logic from those materials rather than from speculation or conjecture, the opinion may pass, even though the trial court or other experts disagree with its conclusion or the methods and materials used to reach it." (*Davis,* at p. 492.)

Dr. Zhang testified at trial that case reports "sometimes are very important" in determining causation, "especially for the rare disease." He explained mesothelioma of the TVT is so rare that a proper epidemiological study would require participation of the population of the planet, making it "virtually impossible" to conduct. To the extent the Fluor defendants rely on the contrary opinion of their expert Dr. Alexander, "[i]t is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'" (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514; accord, *Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 652 ["The jury was certainly free to side with [defense expert's] opinions and conclusions over [plaintiff's expert's]. And we are not free to reweigh this evidence."].)

Finally, the Fluor defendants contend Dr. Zhang failed to rule out other causes of Sabetian's mesothelioma of the TVT. Contrary to their assertion, Dr. Zhang did not "acknowledge[] that there are multiple potential causes" of Sabetian's condition.

When asked on cross-examination whether trauma is a risk factor for mesothelioma of the TVT, Dr. Zhang responded, "[T]here's no . . . evidence, scientific and medical indicating trauma itself can absolutely cause mesothelioma." While he acknowledged that in one study the author identified viral infection and ionizing radiation as "other hypothetical causes" of mesothelioma of the TVT, he did not agree with the conclusion. Further, that study stated, "Asbestos is the only established risk factor for testicular mesothelioma." Dr. Zhang acknowledged genetic causes of the disease where it occurred in individuals as young as seven. But even if genetic predisposition contributed to Sabetian's development of mesothelioma of the TVT, it does not follow his exposure to asbestos did not substantially increase his risk. Dr. Zhang was not required to "exclude all other possibilities" in expressing an opinion that asbestos exposure is a substantial factor in increasing the risk of an individual developing mesothelioma of the TVT. (*Cooper v. Takeda Pharmaceuticals America, Inc., supra,* 239 Cal.App.4th at p. 580.)

C.      *The Trial Court Did Not Err in Applying California Law*
        1.      *Proceedings below*
                (a)      Defendants' pretrial choice of law motions
        In August 2018 codefendants Foster Wheeler, LLC, Exxon Mobil Corporation, and ExxonMobil Oil Corporation filed pretrial motions to apply Iranian law. The Fluor defendants joined the motions. The motions sought to apply Iranian law as to the negligence standard of care, strict liability, joint and several liability, punitive damages, compensatory damages, and loss of consortium, arguing California and Iranian law materially differed as to each issue and Iran's legitimate governmental

36

interest in the issues would be impaired if California law was applied.

In support of their motions, defendants filed a declaration from Mahmoud Katirai, an Iranian lawyer and scholar of Iranian law. On the issue of compensatory damages for personal injury, Katirai opined, "Under Iranian law, [p]laintiffs' remedies are limited to a statutory compensation ('diyeh') pre-determined by the legislature, plus financial damages such as medical expenses and loss of income. These statutory limitations also apply in a personal injury case[] even if the victim does not die . . . . This statutory compensation, which is based on Islamic law, has been codified in the Islamic [Penal Code of Iran], but are of [a] civil nature. . . . [¶] . . . Statutory compensation . . . calls for payment in certain commodities[;] . . . since payment in such commodities is no longer practical, however, the price of such commodities is determined each year by virtue of a decree of the Department of Justice[,] and Iranian courts are required to award [a] remedy based on such decision. Presently, the amount of the statutory compensation in cases of death is 2,310,000,000 Rials. During certain lunar months (i.e., Zel-ghadeh, Zel-hajeh, Rajab, and Moharam) which are called 'haram' (celebratory months), the amount of the statutory compensation in cases of death is 3,080,000,000 Rials." (Footnotes omitted.)

As to loss of consortium, Katirai opined, "Under Iranian law, those who are related to the victim may not claim any loss, other than the statutory compensation ('diyeh'), in case the victim has passed away, unless they have suffered a mental harm as the result of the tort inflicted on their beloved one. . . . [¶] . . . In [the] case of the death of the victim, however, his heirs are entitled to statutory compensation . . . as well as other damages which are

37

provided in the Civil Responsibility Act.  The spouse, however, is not entitled to a remedy for loss of consortium.  [¶] . . .  The Supreme Court of Iran has also decided that, in addition to the statutory compensation, Iranian courts may award financial damages, such as medical expenses and loss of income." (Footnote omitted.)

Katirai also opined punitive damages were not available under Iranian law, declaring that damages under Iranian law "are compensatory and are awarded as the measure of actual loss suffered by the victim, not as a punishment of defendant's conduct."  Katirai opined, "[T]he proper measure of damages under the Civil Responsibility Act is to put the injured party in the same situation he or she would have been in had the injury never occurred . . . .  Thus, compensation is available for financial damages, including physical injuries as well as non-financial damages, including mental and emotional harms, but punitive damages are not available under Iranian law."

Katirai cited to Article 3 of the Iranian "Act for Attraction and Protection of Foreign Capital" (Foreign Investment Act), enacted in 1955, which provided, "The capital imported into Iran . . . as well as profits accrued from the investment of the said capital, shall be subject to the legal protection of the Government, and all the rights, exemptions and facilities accorded to domestic capital and private productive enterprises shall also apply to foreign capital and corporations. . . ."  Based on this language, Katirai stated in his opinion that "if any foreign companies that invest (or do business in Iran) are sued in an Iranian court, Iranian law will apply to them, just as it would for any Iranian company or citizen."  Katirai opined "the intent of the Iranian

Government in making such laws applicable to foreign nationals was to, *inter alia*, promote foreign investment in Iran."

Defendants filed multiple exhibits, translated into English, in support of the Katirai declaration. Article 4 of the 1980 Constitution of the Islamic Republic of Iran stated that all laws and regulations "must be based on Islamic standards." Article 448 of the Islamic Penal Code of Iran provided, "Decreed statutory compensation ('diyeh moghadar') consists of a specified property which has been provided in the [holy] religion . . . when a non-intentional crime has been committed and has caused death, [or] loss of a member . . ." Article 549 of the Islamic Penal Code of Iran stated further, "The instances of full (death)[23] statutory compensation are those set forth in the religion and the amount of it will be decided at the beginning of each year by the head of [the] judiciary branch based on the opinion of the leader." A judicial decision of "Chamber 15 of Appellate Court of Tehran Province" held the statutory compensation laws of the Islamic Penal Code of Iran applied to the civil case before it: "In this court's opinion, statutory compensation (diyeh) is of a civil nature, even though it has been mentioned in criminal laws and its rules have been set forth in the said laws and is applied in the way that is normal in criminal matters, because it consists of the definite damages which the legislature, following the [holy] religion, considers as being sustained and the compensation thereof has been guaranteed."

---

[23] The Fluor defendants later presented evidence a tort victim whose injury did not result in death may be entitled to the full amount of statutory compensation depending on the injury, such as when the victim loses both testicles due to the same injury.

39

With their opposition the Sabetians filed a declaration from Amirhassan Boozari, an Iranian law scholar and practitioner. Boozari opined damages for loss of consortium are recoverable under Iranian law, quoting Article 6 of the Civil Liability Act: "When at the time of accident, the victim was, or would have later been, legally responsible for the care of a third party who will be deprived of such care should the victim die, the tortfeasor must pay such a pension to such a third party that is proportionate to the normal life expectancy of the victim as long as such victim would be obligated to render care for such third party." Boozari stated the recovery for a "third party" includes the wife of a tort victim because under Iranian law married men have a legal responsibility "to maintain the emotional and psychological health and balance of each member of their families." Boozari quoted Dr. Hossien Safei, an Iranian civil law expert, as translated: "Emotional distress is one of the intangible damages that are referred to in Article 9 of the Criminal Procedure Code. Even causing damage to a person's emotions due to friendship, family relation, religious belief, and pain and suffering consequent to accidents can be a cause of action for intangible damages. . . . Under Iranian law, one can say that emotional harm must be significant to be viewed as emotional damage."

Boozari challenged Katirai's conclusion the Iranian government intended in enacting the Foreign Investment Act that the language in Article 3 providing that the Act's extension of all "rights, exemptions, and facilities" accorded to domestic entities apply to foreign capital and corporations broadly means Iranian tort law applies to any lawsuit filed against a foreign company investing in Iran, instead opining the language has

40

always been interpreted to apply equal treatment only to "tax exemptions conferred to investments in Iran for domestic investors."

At the October 18, 2018 hearing on the choice of law motions, counsel for codefendants Exxon Mobil Corporation and ExxonMobil Oil Corporation represented to the court that the statutory compensation available under Iranian law for Sabetian's injury would depend on when his "loss occurs," explaining "[i]t goes from 2.3 billion to 3.08 billion Rials, depending on the time of year."

On October 24, 2018 the trial court granted in part and denied in part the motions to apply Iranian law. The court reasoned, "[T]he Government of Iran would have had a strong interest in applying its own laws to a refinery it owned and an employee that it employed. . . . California has little interest in legislating behavior at such refineries and oil fields." However, the court ruled it would apply Iranian law only as to the issues of strict liability, joint and several liability, and punitive damages, as each was not available under Iranian law. The court declined to apply Iranian law to limit Sabetian's recovery of compensatory damages, explaining, "Although the experts do not appear in disagreement that there is some sort of monetary cap on general damages, the Court declines to apply it in this case. Apparently[,] the cap is set by reference to a memorandum prepared by unnamed Iranian government lawyers who have the power to alter the cap as they see fit. Defendants did not produce a sample determination for the Court, leaving the Court in doubt as to what the cap was and how it is determined. The cap also varies by season of the year. As such, the Court is left unsure that the cap is not so arbitrary in nature and application that it

41

would offend fundamental due process if applied in an American court."

The court also declined to apply Iranian law to bar damages for loss of consortium, stating it was "worried that Iran does not neatly define loss of consortium in the same way that California does, and that the damages could be considered in other categories under Iranian law. (*See* Boozari Dec., ¶¶ 55-58.) Therefore, the Court finds that this prohibition is not established with sufficient clarity in Iranian law to allow for application in this case." The court issued its ruling without prejudice to its later reconsidering the ruling, stating, "The subject of what law to apply to a trial, and how to instruct the jury, are under the continuing jurisdiction and responsibility of the trial judge. Sometimes, the evidence can evolve in a direction that causes revision in the law to be submitted to the jury. Therefore, the trial court retains its power to revise these rulings as it sees fit and to hear further evidence from experts regarding Iranian law should it find such evidence necessary."

(b) The Fluor defendants' posttrial choice of law motions

In their motion for new trial, the Fluor defendants addressed the choice of law issue and submitted a supplemental declaration from Katirai. Katirai again opined Iranian law limited Sabetian's recovery to a statutorily prescribed amount for his physical impairment, plus medical expenses and lost income. The Iranian Department of Justice determines the formula for statutory compensation each year. "For the loss of testes," Katirai declared Sabetian was entitled to "the full statutory compensation amount," or 2.7 billion Rials (approximately

42

$64,000).[24]  Sabetian was also entitled to an uncertain percentage of the same amount for impairment of his general health. Sabetian's recovery for his physical injury was therefore limited to a maximum of two times the amount allowed for a single injury, 5.4 billion Rials (approximately $128,000).

Katirai also opined that under Iranian law Soraya "is not entitled to any monetary compensation for the harms listed on the Special Verdict. . . .  [¶]  . . .  Under Iranian law, a spouse of a living plaintiff is not entitled to any recovery unless the spouse has suffered a mental injury as the result of the incident which inflicted an injury on the plaintiff."  Katirai noted the special verdict form did not award to Soraya any compensation for a mental injury.

The Fluor defendants attached to the supplemental Katirai declaration an Iranian news article, translated into English, announcing the Iranian Department of Justice's payment schedule for the Iranian calendar year running from March 21, 2019 to March 20, 2020.  The article quoted the first deputy head of Judiciary as stating, "[I]n the new year, during regular months, the statutory compensation (diyeh) for a Muslim male shall be 270 million Toumans [2,700,000,000 Rials].  Of course, during the sacred [haram] months, the said amount would be increased by one third."  The Fluor defendants also submitted an English translation of Article 665 of the Islamic Penal Code of Iran, which stated, "Full statutory compensation ('diyeh') shall apply in cases where both testes are amputated at the same time; the removal of [the] left testis shall require payment of two

---

[24]  Katirai appears mistakenly to have believed both of Sabetian's testicles were removed to treat his mesothelioma.  The record reflects only his right testicle was removed.

43

third[s] of the statutory compensation . . . and the removal of the right testis shall require payment of one third of the statutory compensation."

### 2. *Governing law*

"'[T]he governmental interest approach generally involves three steps. First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state" [citation] and then ultimately applies "the law of the state whose interest would be more impaired if its law were not applied."'" (*McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 87-88 (*McCann*); accord, *Chen v. Los Angeles Truck Centers, LLC* (2019) 7 Cal.5th 862, 867.)

"[A] separate conflict of laws inquiry must be made with respect to each issue in the case . . . ." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 920 (*Washington Mutual*); accord, *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 110 (*Kearney*) ["distinct state interests . . . may underlie separate aspects of the issue in question"]; *Smith v. Cimmet* (2011) 199 Cal.App.4th 1381, 1395 [the governmental interest analysis must be performed separately "with regard to

44

the particular issue in question"]; *Beech Aircraft Corp. v. Superior Court* (1976) 61 Cal.App.3d 501, 518 ["Each choice of law issue requires separate consideration."].)

"The party arguing that foreign law governs has the burden to identify the applicable foreign law, show that it materially differs from California law, and show that the foreign law furthers an interest of the foreign state." (*Frontier Oil Corp. v. RLI Ins. Co.* (2007) 153 Cal.App.4th 1436, 1465; accord, *Washington Mutual, supra*, 24 Cal.4th at p. 919 [the movant ""'must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it'""].) We review the choice of law question de novo. (*Scott v. Ford Motor Co.* (2014) 224 Cal.App.4th 1492, 1503; accord, *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 274 ["The choice-of-law issue is a legal one that is decided de novo."].)

In *McCann*, the Supreme Court held Oklahoma's statute of repose, which "required any cause of action against a designer or constructor of an improvement to real property to be filed within 10 years of the substantial completion of the improvement," applied to bar the cause of action brought by a California resident who was exposed to asbestos in Oklahoma decades earlier while he was a resident of that state. (*McCann, supra*, 48 Cal.4th at pp. 74-75, 102.) The *McCann* court found Oklahoma had "a legitimate interest in attracting out-of-state companies to do business within the state, both to obtain tax and other revenue that such businesses may generate for the state, and to advance the opportunity of state residents to obtain employment and the products and services offered by out-of-state companies." (*Id.* at pp. 91-92.) The court reasoned, "In the absence of any explicit

45

indication that a jurisdiction's 'business friendly' statute or rule of law is intended to apply only to businesses incorporated or headquartered in that jurisdiction (or that have some other designated relationship with the state—for example, to those entities licensed by the state), as a practical and realistic matter the state's interest in having that law applied to the activities of out-of-state companies within the jurisdiction is equal to its interest in the application of the law to comparable activities engaged in by local businesses situated within the jurisdiction." (*Id.* at p. 92.)  Although California also had a legitimate interest in the compensation of its resident, the court concluded Oklahoma's interest would be more impaired by application of California law than the converse.  (*Id.* at pp. 96-98.)  The court reasoned, "If Oklahoma's statute were not to be applied because plaintiff had moved to a state with a different and less 'business-friendly' law, Oklahoma could not provide any reasonable assurance—either to out-of-state companies or to Oklahoma businesses—that the time limitation embodied in its statute would operate to protect such businesses in the future."  (*Id.* at p. 98.)

> 3.    *The Fluor defendants' challenge to the jury's award of damages to Soraya for loss of consortium is untimely*

As discussed, Judge Kralik declined to apply Iranian law to bar Soraya's claim for loss of consortium without prejudice to the trial court revisiting the ruling if the evidence "evolve[s] in a direction that causes revision in the law to be submitted to the jury."  The court also retained its power to hear evidence from experts regarding Iranian law if it became necessary.  In their motion for new trial, the Fluor defendants argued the court

should strike the damages awarded to Soraya for loss of consortium because the special verdict clarified the types of injuries Soraya suffered, none of which was compensable under Iranian law. On appeal, the Fluor defendants argue the trial court erred in denying their motion because "the Special Verdict form revealed the exact loss for which recovery was awarded to [Soraya]: past and future 'noneconomic loss, including loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support,'" none of which is available under Iranian law. They argue the spouse of a living tort victim can recover only damages for "mental injury," and at trial the Sabetian's "proffered no evidence that [Soraya] sustained any 'mental injury.'" The Fluor defendants' argument illustrates the untimeliness of their contention: Both sides prepared for trial based on California law.

"'"[G]enerally speaking the forum will apply its own rule of decision unless a party litigant *timely* invokes the law of a foreign state."'" (*Washington Mutual, supra*, 24 Cal.4th at p. 919, italics added; accord, *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581.) Although California law does not clarify what constitutes a timely request to apply the law of another state, a timely request will necessarily be one that does not prejudice an opposing party. Here, the record does not reflect any objection raised by the Fluor defendants to instruction of the jury with CACI No. 3920 on loss of consortium under California law. Rather, the Fluor defendants first raised the application of Iranian law (following Judge Kralik's ruling) in their motions for new trial. Had the Fluor defendants raised the applicability of Iranian law during trial—or after the close of the Sabetians' case—the parties could have addressed the choice of law question in light of the evidence

47

presented at trial before the case was submitted to the jury. And had the trial court indicated it was revisiting its ruling that California law applied, the Sabetians potentially could have presented evidence and argument at trial to satisfy their burden to show compensable injury under Iranian law.[25]

Further, had the trial court ruled in favor of the Fluor defendants before the case was submitted to the jury, the court could have instructed the jury on the types of damages that are compensable under Iranian law for loss of consortium. (See *Chen v. Los Angeles Truck Centers, LLC, supra*, 7 Cal.5th at p. 870 ["After the court determines the choice of law, factfinders must then 'try the facts necessary to determine liability in accordance with such choice.'"].) As the trial court observed in denying the Fluor defendants' posttrial motions, "[N]one of the parties indicated that it wanted this Court to apply Iranian law during the trial. Had the Court applied Iranian law, the jury would have been asked to deliberate the case based on the law given to it, and the jury has been discharged." Under these

---

[25] For example, Judge Kralik credited Boozari's opinion the Iranian law rule that a "tortfeasor must pay . . . a pension to . . . [a] third party that is proportionate to the normal life expectancy of the victim as long as [the] victim would be obligated to render care for such third party" could apply to Soraya. Had Soraya been on notice the trial court intended to consider whether Iranian law applied to loss of consortium damages, she arguably could have shown her entitlement to a pension. Further, under California law, "'loss of consortium . . . is principally a form of mental suffering.'" (*Kindrich v. Long Beach Yacht Club* (2008) 167 Cal.App.4th 1252, 1263.) Soraya could have presented evidence focused more specifically on her mental suffering had she been on notice that Iranian law applied.

circumstances, the Fluor defendants' untimely request for the court to apply Iranian law prejudiced Soraya and was properly denied.

4. *The trial court did not err in applying California law to the jury's award of compensatory damages to Sabetian*

    (a)    A true conflict exists between California's and Iran's interests[26]

As to the second prong of the governmental interest test, the Fluor defendants contend a true conflict exists between California's interest in providing a remedy for tort victims who are California residents and Iran's interest in "protecting businesses operating in Iran against unknown or exorbitant tort liability, to attract foreign investment in Iran, in accordance with

---

[26]    We do not address the first prong of the governmental interest test given the parties' agreement this prong is satisfied because the laws of Iran and California are different. Further, in contrast to the Fluor defendants' challenge to the application of California law to damages for loss of consortium, which we conclude was untimely, the Fluor defendants' challenge to the award of compensatory damages was timely because application of Iranian law did not require additional evidence to be presented at trial or a revision in the jury instructions. Rather, as Judge Kralik found, the experts agreed that Iranian law provided a cap on compensatory damages. As the defendants argued at the pretrial hearing before Judge Kralik, the court would consider the amount of the cap under Iranian law "about at the time of [the] verdict." Thus, the Fluor defendants' posttrial motion was timely to the extent it sought to cap the jury's award of compensatory damages based on Iranian law.

the Foreign Investment Act." Soraya argues there is no true conflict because the purpose of tort liability in both Iran and California is to compensate the victim for his or her injury. Neither party is correct. There is a true conflict between California and Iranian law, but the conflict is between compensation of injured parties based on the evidence of injury (California) and compensation under Islamic law (Iran).

As discussed, at the second step of the governmental interest analysis, we must "examine 'each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.'" (*McCann, supra*, 48 Cal.4th at p. 90.) The Fluor defendants do not dispute California has a legitimate governmental interest in having its law applied. The principal purpose of a damages award under California tort law is "to compensate a wrongfully injured party for injury to person or property." (*Romo v. Ford Motor Co.* (2003) 113 Cal.App.4th 738, 746; accord, Civ. Code, § 3281 ["Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."].) As the *McCann* court observed, application of California law "to a current California resident who suffers an . . . illness as a result of his . . . prior exposure to asbestos in another jurisdiction would assist such residents in obtaining compensation for their injuries and in not becoming dependent on the resources of California for necessary medical, disability, and unemployment benefits." (*McCann,* at p. 96.) Thus, California's interest is substantial.

We disagree, however, with the Fluor defendants' characterization of Iran's interest as the promotion and protection of foreign investment in Iran. We must evaluate Iran's

50

interest in the context of the particular Iranian law the Fluor defendants seek to apply. (See *McCann, supra*, 48 Cal.4th at p. 91 [Court of Appeal erred in concluding Oklahoma's law governing design and construction deficiencies on real property was "substantially a local one" where statute sought to protect and incentivize out-of-state business].) The Fluor defendants assert the salient Iranian interest at issue is embodied in its Foreign Investment Act, which protects foreign companies doing business in Iran by applying Iranian law to claims arising from conduct in Iran. But the Fluor defendants seek to impose the limitation on compensation for personal injury actions as codified in the Islamic Penal Code of Iran "based on Islamic law," which provides statutory compensation as "provided in the [holy] religion" to compensate for unintentional conduct resulting in the "loss of a member." The evidence submitted by the Fluor defendants highlights this interest served by Iranian law. They submitted an Iranian news article characterizing statutory compensation as the amount due to "a Muslim male" in a particular calendar year, as well as evidence showing the amount of statutory compensation depended on whether the victim's loss occurred in one of the "sacred" months of the year.[27] In the case

---

[27] The Fluor defendants assert that Katirai's supplemental declaration "explained that in a personal injury action, Iranian law allows recovery of statutory compensation for physical impairment *that does not vary by season or date where, as here, the claimant is alive at trial*." (Italics added, fn. omitted.) Katirai's supplemental declaration contains no such explanation, but rather, is silent as to compensation due in the sacred months of the Iranian calendar. Evidence submitted in support of the supplemental declaration indicates, without qualification, "during the sacred [haram] months, the [statutory compensation]

51

of the loss of a testicle, the Islamic Penal Code of Iran specifies payment of one-third the amount of full statutory compensation for removal of the right testicle, and two-thirds of the amount for the left,[28] plus an additional proportion of the statutory compensation for impairment to general health.  There can be no dispute these rules are "based on Islamic standards."

Therefore, there is a true conflict between Iran's interest in compensation of a tort victim whose injury occurred in Iran in accordance with Islamic law, and California's interest in compensation of its residents according to proof at trial.  Both jurisdictions have legitimate interests in the application of their own law.

> (b) California's interests will be more impaired by the failure to apply its laws

"Under the comparative impairment analysis, we must 'carefully evaluate[] and compare[] the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state."'"

---

amount would be increased by one third."  Regardless of whether the rule would apply to Sabetian in this case, the variation in prescribed recovery by reference to the sacred months of the Iranian calendar illustrates the essential religious nature of Iran's law of statutory compensation.

[28]     In their motion for new trial, the Fluor defendants requested the trial court issue a remittitur for the dollar equivalent of twice the statutory compensation amount (that is, full statutory compensation for Sabetian's loss of his right testicle, and full compensation for impairment of his general health).

(*McCann, supra*, 48 Cal.4th at pp. 96-97; accord, *Kearney, supra*, 39 Cal.4th at p. 108.) We must determine the appropriate ""limitations on the reach of state policies—as distinguished from evaluating the wisdom of those policies . . . . [E]mphasis is placed on the appropriate scope of conflicting state policies rather than on the 'quality' of those policies . . . .'" [Citation.] [¶] Accordingly, our task is not to determine . . . [which] rule is the better or worthier rule, but rather to decide—in light of the legal question at issue and the relevant state interests at stake— which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." (*McCann*, at p. 97; accord, *Kearney*, at p. 112.)

The Fluor defendants are correct that "a jurisdiction ordinarily has the 'predominant interest' in regulating conduct that occurs within its borders (citations), and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." (*McCann supra*, 48 Cal.4th at pp. 97-98.) That argument has some force here, where Sabetian's injury was caused by conduct that occurred in Iran while he was a resident of that country. But the concern in *McCann*—that applying California's law would prevent Oklahoma from providing "any reasonable assurance . . . that the time limitation embodied in its statute would operate to protect . . . businesses in the future" (*McCann*, at p. 98)—does not apply with the same force to the present circumstances where the Iranian law at issue does not seek to promote and protect foreign businesses with domestic

53

business dealings, but rather, to ensure damages awards are consonant with state-endorsed religious teachings.

California's interest in protecting recovery of damages for injuries suffered by its residents would be severely impaired if Iranian law applied in light of the significant reduction in recovery under Iran's statutory compensation scheme. Sabetian suffered his injury while a resident of California, and California has an interest in ensuring that Sabetian is fully compensated so he does not become dependent on California's resources for necessary medical, disability, and unemployment benefits. By contrast, Iran's interest in limiting damages paid by a foreign company to a California resident in accordance with the tenets of Islamic law (the same as Iranian companies) is relatively weak. Thus, California law applies to the Sabetians' recovery of compensatory damages.

## DISPOSITION

The judgment is affirmed. Soraya is to recover her costs on appeal.

FEUER, J.

WE CONCUR:

PERLUSS, P. J.

SEGAL, J.